IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROGER AND LINDA DYE, *et al.*, | |
|     *Plaintiffs*, | |
| v. | Civil Action No. ELH-19-3304 |
| MLD MORTGAGE INC., d/b/a THE MONEY STORE | |
|     *Defendant*. | |

**MEMORANDUM OPINION**

This putative class action concerns an alleged kickback scheme between MLD Mortgage, Inc. d/b/a The Money Store ("MLD" or "The Money Store")[1] and All Star Title, Inc. ("All Star"), a Maryland based title and settlement services company. Plaintiffs Roger and Linda Dye (the "Dye Plaintiffs"), Lynn Glasser and Nicole Cole (the "Glasser Plaintiffs"), and Larry Bussard, are borrowers in connection with residential mortgages. They have sued MLD in a Complaint that is 53 pages in length, supported by 12 exhibits, complaining that they are victims of an illegal kickback scheme. ECF 1 (the "Complaint").

According to plaintiffs, MLD made referrals of their loans and the loans of others to All Star for title and settlement services. In exchange, All Star allegedly laundered payments to MLD, largely through third-party marketing companies. All Star is not a defendant and is allegedly now defunct. ECF 27-1 at 1. According to plaintiffs, as a result of the scheme, they paid inflated settlement fees. Plaintiffs contend that the kickback scheme violated the Real

---

[1] The parties sometimes put a comma after the word "Mortgage," but are not consistent in doing so. *Compare, e.g.*, captions in ECF 1 and ECF 27 with ECF 1, ¶ 1 and ECF 27 at 1.

Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 (Count I), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Count II).

MLD has moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) (ECF 27), supported by a memorandum. ECF 27-1 (collectively, the "Motion"). Plaintiffs oppose the Motion. ECF 28. And, defendant has replied. ECF 29. Plaintiff has also submitted a notice of supplemental authority. ECF 30.

Although All Star is not a party to this case, All Star's conduct is at issue here and in other suits in this District. And, plaintiffs' lawyers in this case are counsel to plaintiffs in several other cases in this District involving All Star. *See Brasko v. Howard Bank*, SAG-20-3489; *Ekstrom v. Congressional Bank*, ELH-20-1501; *Wilson v. Eagle National Bank*, TDC-20-1344; *Somerville v. West Town Bank & Trust*, PJM-19-0490; *Remsnyder v. MBA Mortg. Servs., Inc.*, CCB-19-492; *Kadow v. First Federal Bank*, PWG-19-0566; *Walls v. Sierra Pacific Mortgage Co., Inc.*, GLR-19-595; *Avery v. J.G. Wentworth*, TJS-19-3303; and *Donaldson v. Primary Residential Mortgage, Inc.*, ELH-19-1175.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I. Factual Background[2]

### A. The Scheme

Plaintiffs allege that MLD, through its agents and employees, "received and accepted illegal kickbacks [from All Star] in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services. . . ." ECF 1, ¶ 2. They contend that MLD concealed the scheme, *inter alia*, by "laundering kickbacks through third party marketing companies"; "false allocation of title and settlement fees"; and "false and fraudulent representations and omissions" in loan documents. *Id.* ¶ 5.

According to plaintiffs, since at least 2008, All Star "design[ed] and execut[ed] a scheme…to pay kickbacks to various mortgage lenders and their brokers, loan officers and other employees (collectively, 'Participating Lenders') in exchange for the Participating Lender's assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services." *Id.* ¶ 15. In exchange for "assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services," All Star allegedly paid "kickbacks" to mortgage lenders, based on the number of loans referred to All Star and the amount of profit All Star derived from the loan referrals. *Id.* ¶¶ 15-16.

---

[2] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the Complaint. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). Further, the Court may consider documents attached to the Complaint, "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Throughout the Opinion, I cite to the electronic pagination. It does not always correspond to the pagination that appears on the parties' submissions.

These kickbacks took various forms, according to the allegations. For example, All Star sometimes purchased "marketing materials" for the mortgage lenders to "use in soliciting borrowers." *Id.* ¶ 18. On other occasions, All Star wrote checks directly to the mortgage lenders, which were deposited into a "sham entity used for the express purpose of receiving and accepting kickbacks and concealing the same." *Id.* ¶ 19. For the most part, however, All Star and the mortgage lenders agreed "to launder[] the kickback payment through a third-party marketing company." *Id.* ¶ 20. Mortgage lenders "and/or their branch managers, mortgage brokers, loan officers, or other employees frequently use[d] third party marketing companies…to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances and reverse mortgages…." *Id.* ¶ 21. These third-party marketing companies "specializ[ed]" in direct mail solicitations, production for direct mail solicitations, and "'live transfer' leads," in which potential borrowers who call a "centralized telemarketing company" are transferred "'live'" to a participating lender. *Id.* ¶ 22.

Under the kickback agreement, the participating mortgage lender receiving the kickback from All Star "identifie[d] a third party marketing company that" the lender was already using for its marketing services. *Id.* ¶ 23. Thereafter, All Star made "the kickback payment to the third party marketing company" and the participating lender "receive[d] and accept[ed] the kickback payment when the third party marketing company applie[d] All Star's payment for the benefit of the" lender. *Id.*

Using third-party marketing companies, according to plaintiffs, "creat[ed] the false impression that All Star" was purchasing marketing services for itself, rather than on behalf of the participating mortgage lender. *Id.* ¶ 24. Moreover, "to further conceal the kickbacks," plaintiffs maintain that All Star and the participating lenders "hoped to be able to use claims of

'co-marketing' as a sham." *Id.* ¶ 25. But, plaintiffs allege that "All Star makes clear that the kickback payments are predicated on" the mortgage lender making a specific number of loans that are assigned to All Star. *Id.* ¶ 26.

Plaintiffs claim that "[o]ne of the purposes of the All Star Scheme is to defraud borrowers into paying for illegal kickbacks." *Id.* ¶ 27. To achieve that purpose, All Star and mortgage lenders "conspire to and agree to fix the prices All Star charges…borrowers for title and settlement services." *Id.* ¶ 28. According to plaintiffs, these "fixed prices are artificially inflated and higher than the prices that borrowers would be charged without the Kickback Agreement." *Id.* Plaintiffs refer to this as the "Fixed Price Overcharge." *Id.* The fixed prices also allegedly include "a sum certain that is not associated with any legitimate title or settlement service," because it is "charged for the sole purpose of forcing borrowers to pay for the cost of the illegal kickbacks." *Id.* ¶ 29. Plaintiffs refer to this charge as the "Kickback Overcharge." *Id.*

The participating mortgage lenders allegedly agreed to "refuse to deal with any other title and settlement services company on those loans generated by the kickbacks…." *Id.* ¶ 30. The lenders benefited from these agreements in various ways, including "substantial interest and commissions," and "the costs for title and settlement services fees [were] financed into the loan and paid for by borrowers from loan proceeds such that the [mortgage lenders] earn[ed] interest and other fees from the Fixed Price and Kickback Overcharges." *Id.* ¶ 31.

In addition, plaintiffs assert that All Star and participating lenders "use[d] the interstate mails and wires in furtherance" of the scheme. *Id.* ¶ 32. In particular, they chose "to transmit, receive and accept the illegal kickback payments over interstate wires." *Id.* ¶ 33. And, they "use[d] both interstate mails and wires to lure borrowers into the All Star Scheme." *Id.* ¶ 35. According to plaintiffs, some of the third-party marketing companies would generate "'leads

lists,'" *id.* ¶ 37, which were then used to target borrowers through "printed direct mail pieces…that encourage borrowers to contact the [mortgage lenders] and apply for a residential mortgage loan, refinance or reverse mortgage." *Id.* ¶ 38.

Further, plaintiffs aver that the participating mortgage lenders "solicit[ed] borrowers over the telephone" and used "interstate wires to make these telemarketing calls to potential borrowers." *Id.* ¶ 40. Further, plaintiffs contend that the "'live transfer' leads" also utilized interstate wires. *Id.* ¶ 41. In sum, plaintiffs assert: "All Star's records document that [mortgage lenders] used illegal kickback payments to lure thousands of borrowers into the All Star Scheme using these borrower solicitation techniques." *Id.* ¶ 42.

**B. MLD**

Plaintiffs allege that by September 2014, defendant accepted and received "kickbacks paid by All Star in exchange for the assignment and referral of The Money Store loans to All Star for title and settlement services." *Id.* ¶ 44. According to plaintiffs, MLD initially agreed to refer loans from its branch in Leesburg, Virginia (the "Leesburg Branch"). *Id.* ¶¶ 44, 45.

"By October 2014," All Star and The Money Store agreed to "fix prices for title and settlement services" from the Leesburg Branch at "$1,500 plus title insurance." *Id.* ¶ 45. According to plaintiffs, this was "approximately $500 to $1,000 more than All Star is charging other" mortgage lenders on similar loans. *Id.* Plaintiffs allege that the price of $1,500 also includes a "Kickback Overcharge of $300 which…is not associated with any legitimate settlement service." *Id.* ¶ 46. According to plaintiffs, this $300 charge "is the minimum amount of actual damages" sustained by The Money Store borrowers during the relevant time period. *Id.* ¶ 47.

Plaintiffs claim that, during the first week of October 2014, All Star paid two kickback payments of $5,000 each to The Money Store, laundered through Titan List and Mailing ("Titan"), a "Florida based marketing company." *Id.* ¶¶ 48-51. In other words, All Star would send the money "to The Money Store over interstate wires, with the payment originating from All Star in Maryland and The Money Store receiving the payment, by and through Titan, in Florida." *Id.* ¶ 49. Thereafter, MLD allegedly chose "to use All Star's kickback payments to cause Titan to print and mail thousands of The Money Store direct mail solicitations to lure potential borrowers in the All Star Scheme." *Id.* ¶ 50. From the end of September through October 2014, MLD assigned and referred "approximately 49 loans to All Star for title and settlement services." *Id.* ¶ 52.

In November 2014, All Star again allegedly paid two kickbacks of $5,000 each to MLD, through Titan. *Id.* ¶¶ 53-54. Plaintiffs assert that MLD used the kickbacks to "cause Titan [to] print and mail a total of 36,330 The Money Store solicitations to lure potential borrowers into" the scheme. *Id.* ¶ 55.

Thereafter, All Star and The Money Store agreed "to charge a $375 Kickback Overcharge per closed loan." *Id.* ¶ 56. Plaintiffs allege that All Star, MLD and Titan engaged in the same exchange in November and December 2014, as well as in January, February, March, and April 2015. *Id.* ¶¶ 59-74. In fact, according to plaintiffs, MLD and All Star "agree[d] to and perform[ed] the Kickback Agreements through at least March 2016." *Id.* ¶ 75.

Plaintiffs claim that, in addition to employees of MLD at the Leesburg Branch, "loan officers, branch managers and others employed by The Money Store" in branches in "Virginia, Fort Washington, Pennsylvania, and Florham Park, New Jersey" assigned and referred loans to All Star in furtherance of the scheme. *Id.* ¶ 77. In total, MLD allegedly "assign[ed] and refer[ed]

220 [of] The Money Store loans, secured by real property across 25 states and the District of Columbia, to All Star in furtherance of the Kickback Agreement and All Star Scheme." *Id.* ¶ 76.

Plaintiffs posit, *id.* ¶ 80 :

No title services [were] provided by any The Money Store employee and/or agent, associated with the receipt and acceptance of the kickbacks. The payment by All Star and the receipt and acceptance by The Money Store of the kickbacks [were] made solely for the assignment and referral of The Money Store borrowers to All Star.

Further, they assert that, as a result of MLD's participation in the All Star scheme, MLD borrowers, including plaintiffs, were

harmed because they [were] defrauded into being charged and paying amounts that [were] not related to any legitimate title and settlement services; [were] charged and pa[id] higher amounts for title and settlement services that [sic] they would have without the Kickback Agreement and the All Star Scheme[;] [were] denied kickback free title and settlement services . . .; and [were] denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

*Id.* ¶ 79.

## C. MLD's Alleged Fraudulent Concealment

Plaintiffs assert that MLD and All Star "under[took] affirmative acts that fraudulently conceal[ed]" the kickback scheme. *Id.* ¶ 106. In particular, according to plaintiffs, MLD and All Star used third-party marketing companies to conceal the kickbacks. *Id.* ¶¶ 107, 108. Through phony invoices and payment records, MLD and All Star allegedly created a "false record" that "conceal[ed] the kickbacks, Kickback Agreement and All Star Scheme from any person…including auditors, regulators, law enforcement or borrowers." *Id.* ¶ 108.

In addition, plaintiffs claim, *id.* ¶ 111:

As a regular and continuing business practice, The Money Store and All Star allocate[d] the charges for title and settlement services associated with a borrower's loan only to those categories of title services not included in the APR

[Annual Percentage Rate], thereby falsely minimizing the APR reported on The Money Store borrowers' loan documents and required federal disclosures.

The Truth in Lending Act ("TILA") requires lenders to report the Annual Percentage Rate ("APR") associated with a loan. *Id.* ¶ 109.[3] Among other things, plaintiffs note that "'fees for title examination, abstract of title, [and] title insurance'" are supposed to be excluded from the APR calculation. *Id.* ¶ 112 (citation omitted). But, settlement, closing fees, and application signing fees "are settlement service costs required to be included in the APR calculation." *Id.* Plaintiffs contend that MLD and All Star "allocate[ed] the charges associated [with] conducting a settlement or closing with a borrower to the category of 'title exam' or 'abstract,'" and thereby created a "false, and falsely minimized, APR." *Id.* According to plaintiffs, this means that "All Star and The Money Store allocate[d] all charges, including that portion attributable to conducting a settlement or closing, to 'Title Exam' or 'Abstract,' which are excluded from the APR." *Id.* ¶ 115; *see* ECF 1-7 (Glasser HUD-1, May 14, 2015).

Plaintiffs point to a series of emails that allegedly show All Star's practice of manipulating the APR "as a regular business practice." ECF 1, ¶ 113; *see* ECF 1-8; ECF 1-9; ECF 1-10. Further, plaintiffs assert that MLD "participate[d] in and ratif[ied] this false allocation of fees…. throughout the time period The Money Store [was] participating in the All Star scheme." ECF 1, ¶ 114; *see also* ECF 1-11 (Emails between The Money Store employees and Heather Reid, All Star loan processor, December 21, 2015). And, plaintiffs allege that All Star used various software programs, including one called "Titlehound," to make "these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce The Money Store loan documents to present to borrowers and on which The Money

---

[3] The APR is "is a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made." 12 C.F.R. § 1026.22(a)(1).

Store, and All Star intended borrowers rely." ECF 1, ¶ 118. This false allocation of fees, according to plaintiffs, "fraudulently concealed from The Money Store borrowers the coordinated business relationships between All Star and each The Money Store. . ." *Id.* ¶ 119.

Moreover, plaintiffs maintain that defendant made false representations to borrowers in the "Good Faith" estimate forms. *Id.* ¶¶ 120-123.[4] According to plaintiffs, MLD fraudulently included "charges that are not title services and lender's title insurance including the Kickback Overcharge." *Id.* ¶ 123; *see* ECF 1-12 (Glasser "Good Faith Estimate"). This practice, according to plaintiffs, concealed from borrowers "the illegal kickback"; "the fact and amount of" overcharges; "the coordinated business relationship between All Star and The Money Store"; and "the pattern of racketeering activity All Star perform[ed] with The Money Store." ECF 1, ¶ 124

Further, plaintiffs posit that MLD and All Star made false representations on borrowers' HUD-1 settlement statements. *Id.* ¶ 130.[5] In particular, plaintiffs contend that "All Star and The Money Store. . . cause[d] the false allocation of fees. . . to repeat and appear on The Money Store borrowers' HUD-1 statements…." and omitted "the amount of the kickback received by The Money Store…" *Id.* ¶¶ 130-131. Similarly, plaintiffs claim that the amount of the overcharge "or other flat fee" associated with the scheme did not appear on borrowers' HUD-1 forms. *Id.* ¶ 132.

### D. The Dye Plaintiffs

The Dye Plaintiffs obtained a "residential mortgage loan originated by The Money Store…in relation to the refinancing" of their residence in North Carolina. *Id.* ¶ 82. Jody

---

[4] The Money Store, as a lender, was obligated to provide a "Good Faith Estimate" form to the borrower. ECF 1, ¶ 121; 12 C.F.R. App'x C to Part 1024.

[5] The HUD-1 settlement statement is a standard form indicating fees charged to a borrower by a mortgage lender or broker. ECF 1, ¶¶ 128, 129.

Alston, a loan officer at the Leesburg Branch, referred their mortgage to All Star. *Id.* ¶ 83.

Plaintiffs contend that this referral was "quid pro quo for the kickbacks All Star pa[id] and The

Money Store receive[d] and accept[ed] on or about March 6, 2015 and/or April 7, 2015 by and

through Titan." *Id.* As a result, according to plaintiffs, the Dye Plaintiffs were deprived "of their

choice of title and settlement service provider and . . . kickback-free title and settlement

services." *Id.*

Further, plaintiffs contend that All Star charged the Dye Plaintiffs "$1,322 in title and

settlement service fees," which was "higher than the same charges would have been," absent the

kickbacks. *Id.* ¶¶ 84-85. In particular, plaintiffs maintain that the "title and settlement service

fees include[d] the approximately $375 Kickback Overcharge…which is the minimum amount

of the Dye Plaintiffs' actual damages…." *Id.* ¶ 86.

According to plaintiffs, the Dye Plaintiffs had "no actual notice before, at or after the

closing of their The Money Store loan of the illegal kickbacks," the relationship between The

Money Store and All Star, the scheme generally, or the resulting overcharges. *Id.* ¶ 136. The

Dye Plaintiffs reviewed their loan documents in advance of the closing, but they reflected the

"false allocation of fees" as well as a "false APR." *Id.* ¶¶ 141, 145, 149. The Dye Plaintiffs

believed the representations made in their loan documents documents because they had "no

reason to believe" that there was "a coordinated business relationship. . . between The Money

Store and All Star" or a kickback scheme. *Id.* ¶ 143.

Plaintiffs contend that The Money Store and All Star also omitted from the documents

provided to the Dye Plaintiffs at their closing, including their HUD-1, "any description or

statement" of a coordinated business relationship between The Money Store and All Star and

"any description or statement of any payment. . . by All Star to The Money Store…related to the Dye Plaintiffs' loan." *Id.* ¶¶ 146, 147.

On or about June 28, 2019, the Dye Plaintiffs were contacted by counsel concerning their loan. *Id.* ¶ 153. This was their "first indication of any potential wrongful" conduct. *Id.* They retained counsel within days, and suit was filed within a year of when the Dye Plaintiffs became "aware of facts giving rise to their causes of action, injuries, and actual damages." *Id.* ¶ 154.

### E. The Glasser Plaintiffs

The Glasser Plaintiffs obtained a residential mortgage loan from MLD in May 2015. *Id.* ¶ 90; *see* ECF 1-7. Plaintiffs claim that Alston referred their mortgage to All Star as a "quid pro quo for the [kickbacks] All Star pa[id] and The Money Store receive[d] and accept[ed]" through Titan. *Id.* ¶ 91. The Glasser Plaintiffs were charged $2,882.50 in "total title and settlement service fees," which allegedly included the "$500 - $ 1,000" in "Fixed Price Overcharge" and "$375 Kickback Overcharge." *Id.* ¶¶ 92-94.

The Glasser Plaintiffs "receive[d] loan documents prepared by The Money Store in advance of their closing and review[ed] those loan documents." *Id.* ¶ 158; *see* ECF 1-12. They aver that the loan documents omitted any description of the coordinated business relationship between defendant and All Star or "the fact that The Money Store w[ould] receive anything of value for the Money Store's assignment and referral of the" loan. *Id.* ¶ 159. And, the documents contained the "false allocation of fees and a false APR. . . ." *Id.* ¶ 161

At the loan closing, the Glasser Plaintiffs were provided with a HUD-1 settlement statement that did not contain any statements concerning the allegedly coordinated business relationship between MLD and All Star or the kickback payments. *Id.* ¶¶ 166; *see* ECF 1-7. And, the HUD-1 contained a "false allocation of fees." ECF 1, ¶ 168.

The Glasser Plaintiffs claim that they were first informed of the potential wrongdoing on June 28, 2019. *Id.* ¶ 172. They retained counsel "within days" and the suit was filed "within months." *Id.* ¶ 173.

### F.  Plaintiff Bussard

Bussard obtained a residential mortgage loan from MLD on October 13, 2014, so as to refinance his mortgage. *Id.* ¶ 98. Defendant's Leesburg Branch referred Bussard's mortgage to All Star as a "quid pro quo" for the kickback MLD received from All Star on September 25, 2014, through Titan. *Id.* ¶ 99. Bussard was charged "at least $1,932 in title and settlement service fees," which included the same overcharges paid by the Glasser Plaintiffs. *Id.* ¶¶ 101-102.

Bussard claims that he first learned of any potential wrongdoing when he received a letter from counsel on June 28, 2019. *Id.* ¶ 191. Thereafter, he retained counsel "[w]ithin days" and the Complaint was filed "within months." *Id.* ¶ 192.

Additional facts are included, *infra*.

## II.  Legal Standards

### A.  Rule 12(b)(1)

The Money Store raises a facial challenge to the Court's subject matter jurisdiction. ECF 27-1 at 3. It argues that plaintiffs lack standing to pursue their claim under Count I because they have not alleged a concrete injury. *Id.*

Under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); s*ee also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166

F.3d 642, 647 (4th Cir. 1999). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Hutton v. Nat'l Bd. of Examiners Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns*, 585 F.3d at 192. Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck*, 848 F.3d at 270). In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848 F.3d at 270; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

## B. Rule 12(b)(6)

Defendant also moves to dismiss under Rule 12(b)(6). A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule

12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n

unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

In a motion under Rule 12(b)(6), courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243); *see Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (citation omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be

reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am.*

*Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id*. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Moreover, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As noted, plaintiffs included 12 exhibits with the Complaint. ECF 1-2 to ECF 1-13. All of the documents are specifically referenced in the Complaint. Accordingly, in ruling on the Motion, I may consider the exhibits without converting the Motion to one for summary judgment.

## C. Rule 9(b)

Given the allegations of fraud, defendant also invokes Fed. R. Civ. P. 9(b). Claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Rule 9(b). *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that an MCPA claim that "sounds in fraud[] is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Under the rule, a claim that sounds in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (citation omitted); *see Fessler v. Int'l Business Machines Corp.*, 959 F.3d 146 (4th Cir. 2020). In other words, Rule 9(b) requires the plaintiff to plead "the who, what, when, where, and how of the alleged fraud" before the parties can proceed to discovery. *United States ex rel. Wilson v. Kellogg Brown & Root*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted)

Rule 9(b) serves several salutary purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

However, by its plain text, Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

### III.  Discussion

Plaintiffs allege that MLD's kickback scheme with All Star violated RESPA, 12 U.S.C. § 2601 (Count I), and RICO, 18 U.S.C. § 1962 (Count II).

In moving to dismiss, defendant first asserts that plaintiffs lack Article III standing under Count I because they have not adequately alleged a concrete injury. ECF 27-1 at 4-5. Second, defendant asserts that the "payment and fees" between All Star and Titan "are protected by RESPA's safe harbor provision." *Id.* at 3.  Third, as to the RICO claim, MLD asserts that plaintiffs did not allege any specific instances of mail or wire fraud, as required to satisfy the definition of "racketeering activity." *Id.* at 6-8.

I shall address each contention, in turn.

## A. Standing

### 1. General principles

It is a bedrock principle that Article III of the Federal Constitution confines the federal courts to the adjudication of "actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted); *see Carney v. Adams*, __ U.S. __, 141 S.Ct. 493, 498 (2020); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020). "Indeed, 'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016)).

"Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Uzuegbunam v. Preczewski,* __ U.S.__, 141 S.Ct. 792, 798 (2021) (citations omitted). Therefore, during the pendency of a case, an actual controversy must exist. *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Int'l Bhd. of Teamsters, Local Union No. 639 v. Airgas, Inc.*, 885 F.3d 230, 234 (4th Cir. 2019); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013). In the absence of a case or controversy, "the court's subject matter jurisdiction ceases to exist . . . ." *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

"Two related doctrines…each originating in the case-or-controversy requirement of Article III…underlie [the] determination [of whether a case is justiciable]. First, a plaintiff must

demonstrate standing…. Second, the case must be 'ripe.'" *Trump v. New York*, __ U.S. __, 141 S.Ct. 530, 535 (2020) (internal citations omitted); *see Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue.); *Spokeo, Inc.*, 136 S. Ct. at 1547 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) ("The standing doctrine derives from the Constitution's limitation on Article III courts' power to adjudicate cases and controversies.") (internal quotation marks and citations omitted). The *Clapper* Court explained, 568 U.S. at 408: "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."

The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III, and prudential standing. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). As discussed, *infra*, "the standing inquiry asks whether a plaintiff ha[s] the requisite stake in the outcome of a case . . . ." *Deal v. Mercer County Board of Ed.*, 911 F.3d 183, 187 (4th Cir. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a particularized injury," which is a requirement that "serves vital interests going to the role of the judiciary in our system of separated powers." *Hollingsworth v. Perry*, 570 U.S. 693, 696 (2013).

To establish Article III standing, a plaintiff must satisfy three elements. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). They are, *id.* (internal quotation marks and citations omitted):

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or

imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

The cases are legion with regard to these elements. *See, e.g., Uzuegbunam*, 141 S.Ct. at 798; *Spokeo, Inc.*, 136 S. Ct. at 1548; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Clapper*, 568 U.S. at 409; *Friends of the Earth, Inc.*, 528 U.S. at 180-81; *Bryant v. Woodall*, 1 F.4th 280, 287 (4th Cir. 2021); *Episcopal Church in South Carolina v. Church Insurance Co. of Vermont*, 997 F.3d 149, 155 (4th Cir. 2021); *Outdoor Amusement Business Ass'n., Inc. v. Dept. of Homeland Security*, 983 F.3d 671, 680 (4th Cir. 2020); *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 361 (4th Cir. 2020); *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 226-27 (4th Cir. 2019); *South Carolina*, 912 F.3d at 726; *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018); *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015); *Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2011); *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011).

As the Fourth Circuit explained in *Deal*, 911 F.3d at 189, the two concepts—actual, ongoing injury or imminent injury—are "disjunctive." An "allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Susan B. Anthony*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5); *see Lujan*, 504 U.S. at 564; *South Carolina*, 912 F. 3d at 726. In contrast, "'[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). This requirement serves "to ensure that the alleged injury is not too speculative for Article III purposes." *Wikimedia Found.*, 857 F.3d at 208.

"For an injury to be traceable, 'there must be a causal connection between the injury and the conduct complained of' by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560). However, "the defendant's conduct need not be the last link in the causal chain[.]" *Id.*; *see also Lexmark Int'l, Inc.*, 572 U.S. at 134 n.6 ("Proximate causation is not a requirement of Article III standing[.]"). "[W]here the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendant's conduct 'upon the action of someone else,'" the traceability requirement is satisfied. *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Of relevance here, the "strictures of Article III standing are no less important in the context of class actions." *Baehr*, 953 F.3d at 252 (citing *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 652 (4th Cir. 2019)). In *Frank v. Gaos*, __ U.S. ___, 139 S. Ct. 1041, 1046 (2019), the Supreme Court made clear that a district court is "powerless to approve a proposed class settlement" if "no named plaintiff has standing."

### 2. Alleged Harms

Plaintiffs assert a variety of injuries. The first is financial: plaintiffs claim that they suffered monetary damages in the form of settlement fee overcharges and marketing fees. *See, e.g.*, ECF 1, ¶¶ 79, 85, 93, 101. According to plaintiffs, the fees they paid to All Star were "higher than the same charges would have been" without the scheme. *See, e.g., id.* ¶ 93.

Plaintiffs also allege a number of related injuries. They assert, for instance, that they were "stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality[.]" *Id.* ¶ 88. Further, they claim that they

were "deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers." *Id.*

### 3. Analysis

As noted, this is a putative class action. But, the Court analyzes standing "based on the allegations of personal injury made by the named plaintiff[s]." *Dreher*, 856 F.3d at 343. Defendant asserts that plaintiffs have failed to allege the concrete and particularized injury required to establish Article III standing. In particular, defendant posits that plaintiffs "cannot show any concrete injury because of the alleged kickbacks." ECF 29 at 4. Rather, according to defendant, plaintiffs "attempt to demonstrate that they have alleged tangible monetary damages by citing to implausible and conclusory allegations made in the Complaint," but the "allegations are paired with no facts in support." *Id.*

Plaintiffs counter that they have alleged that "they paid more than they otherwise would have without the Kickback Agreement and that they even paid more than other borrowers did on similar loans with other lenders who closed with All Star." ECF 28 at 8 (citing ECF 1, ¶¶ 45-47, 56, 79, 85-86, 88, 93-94, 96, 101-102, 104).

MLD's arguments as to standing are specious. Plaintiffs have sufficiently alleged concrete injuries.

At this stage of the litigation, the Court generally must assume the truth of the allegations in the Complaint. Moreover, at this juncture, plaintiffs need not *prove* that they suffered concrete financial injuries. Rather, they must plausibly *allege* that they did. As to the Glasser Plaintiffs, for instance, plaintiffs have alleged: "As a direct and proximate result of the Kickback [agreement]. . . the Glasser Plaintiffs [were] harmed because they [were]: (1) charged and pa[id] more for settlement services than they would have paid without the illegal Kickback

[agreement]. . . ." ECF 1, ¶ 96. They specifically allege that they were overcharged a "$375 Kickback Overcharge." *Id. ¶* 94. The Dye Plaintiffs and Bussard make similar allegations. *See id.* ¶¶ 85, 86, 88, 102, 104. These allegations are sufficient to plead a claim of injury-in-fact.

In *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244 (4th Cir. 2020), the Fourth Circuit concluded that "the deprivation of impartial and fair competition between settlement services providers—untethered from any evidence that the deprivation thereof increased settlement costs—is not a concrete injury under RESPA." *Baehr*, 953 F.3d at 254. However, the plaintiffs in that case did not argue that they were overcharged. In fact, they argued that "'an overcharge is not necessary to have standing to bring [their] RESPA kickback claim.'" *Id.* at 253 (quoting appellants' brief) (alterations in *Baehr*). In contrast, the plaintiffs here have explicitly alleged that they were overcharged for title and settlement services as a result of the alleged kickbacks.

In sum, I am satisfied that plaintiffs have plausibly alleged concrete, financial injuries in the form of overpayments. Therefore, they have adequately pleaded Article III standing. *See Kadow v. First Federal Bank*, PWG-19-0566, 2021 WL 5230560, at *7 (D. Md. Sept. 2, 2020) (concluding that plaintiffs have "adequately alleged injury-in-fact based on the alleged supracompetitive rate they paid for title and settlement services" to satisfy standing requirement).

## B. RESPA Safe Harbor

Plaintiffs contend that "The Money Store, by and through its mortgage brokers, loan officers, employees and/or agents, received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a)." ECF 1, ¶ 225. These "things of value" were payments to third-party marketing companies on behalf of MLD, in order to generate business. *See, e.g., id.* ¶ 107. In

return, The Money Store allegedly referred loans that resulted from the marketing campaign to All Star for title and settlement services.

Congress enacted RESPA in order "to insure that consumers ... are provided with greater and more timely information on the nature and costs of the [mortgage loan] settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices...." 12 U.S.C. § 2601(a). Among other provisions, RESPA prohibits a person from accepting any "kickback," "fee," or "thing of value" as part of a real estate settlement service. 12 U.S.C. § 2607(a). Section 2607(a) states:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

However, Section 8 of RESPA, codified at 12 U.S.C. § 2607(c), contains a safe harbor. It states, in relevant part, *id.*:

> Nothing in this section shall be construed as prohibiting . . . (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed. . .

Based on this provision, defendant posits that "all that existed was a relationship between MLD and All Star that did not involve 'kickbacks' but rather joint-marketing, activity permitted under RESPA." ECF 27-1 at 3. In particular, defendant contends that without providing invoices, as evidentiary proof of the kickbacks, plaintiffs "have failed to allege any plausible facts that the alleged 'kickback' payments were nothing more than payments for actual services rendered expressly protected by RESPA's safe harbor provision." ECF 29 at 2.

Plaintiffs counter that entitlement to RESPA's safe harbor provision is defendant's "defense to prove, not Plaintiffs' obligation to allege." ECF 28 at 5. They also argue that the

Complaint alleges that "each payment transmitted to the marketing companies is not for the provision of services to All Star, but rather, for the benefit of MLD" to conceal the kickbacks. *Id.*

Defendant relies on *Walls v. Sierra Pacific Mortgage Co., Inc.*, GLR-19-595, 2020 WL 1528626 (D. Md. Mar. 31, 2020), *vacated on reconsideration*, 2021 WL 252544, (D. Md. Jan. 26, 2021), to support its argument.[6] In that case, as in this case, the plaintiffs obtained mortgage services from a defendant lender, and the defendant referred title services to All Star in exchange for alleged kickbacks. *Id.* at *1. Further, as in this case, plaintiffs claimed that the kickbacks were "laundered through third-party marketing companies, who created 'sham invoices' or 'sham payment records' to conceal the true nature of the transactions…." *Id.*

At the outset, Judge Russell dismissed plaintiffs RESPA claim on the ground that plaintiffs failed to demonstrate that the lender's payments to All Star were not protected under RESPA's safe harbor provision. However, Judge Russell recently granted the plaintiffs' motion for reconsideration. *Walls v. Sierra Pacific Mortgage Co., Inc.*, GLR-19-595, 2021 WL 252544, at *3 (D. Md. Jan. 26, 2021). He explained: "The Court's misapprehension regarding the direction of the payments between Sierra Pacific and All Star, along with its failure to consider Plaintiffs' plausible allegation that there were no legal services rendered for the payments, led to a clear error: concluding that the alleged kickback payments were protected under RESPA's safe harbor provision." *Id.* Thus, on reconsideration, he found that plaintiffs "have adequately alleged that the payments All Star made to Sierra Pacific were not bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." *Id.*

Further, in *Kadow*, 2020 WL 5230560, Judge Grimm found that plaintiffs "have sufficiently alleged facts that would establish Plaintiffs are outside of RESPA's safe harbor." *Id.*

---

[6] The plaintiffs in *Walls* are represented by the same lawyers who represent the plaintiffs in this case.

at *4. In that case, the plaintiffs alleged that, "with the laundering of kickbacks through third party marketing companies, All Star and Participating Lenders hoped to be able to use claims of 'co-marketing' as a sham and to further conceal the kickbacks and Kickback Agreement from borrowers, regulators and law enforcement." PWG-19-00566, ECF 15, ¶ 31. Judge Grimm reasoned, 2020 WL 5230560, at *5: "This is sufficient at this stage of the pleadings to plausibly contend that the alleged payments were outside of RESPA's safe harbor. It may be that Defendant ultimately will be able to show that all of the payments were for services actually rendered within the safe harbor provisions. However, that must be established after discovery on these claims."

The plaintiffs in this case made the exact same allegation as the plaintiffs in *Kadow*. *See* ECF 1, ¶ 25 (claiming that, with "the laundering of kickbacks through third party marketing companies, All Star and Participating Lenders hoped to be able to use claims of 'co-marketing' as a sham and to further conceal the kickbacks and Kickback Agreement from borrowers, regulators and law enforcement"). They allege that the payments were made solely for referrals and not for the provision of title services, *id.* ¶ 80:

> No title services [were] provided by any The Money Store employee and/or agent, associated with the receipt and acceptance of the kickbacks. The payment by All Star and the receipt and acceptance by The Money Store of the kickbacks [was] made solely for the assignment and referral of The Money Store borrowers to All Star.

In sum, plaintiffs have alleged that the payments were not for marketing services but, instead, were kickbacks for referrals. As Judge Grimm has noted, "[a]lthough some of the payments for these alleged kickbacks were paid in 'marketing materials' and postage, All Star and Defendants allegedly attempted to conceal the true nature of the payments through the use of sham invoices and sham payment records." *Kadow*, 2020 WL 5230560, at *5. Accordingly, at

this stage of the litigation, I am satisfied that plaintiffs have adequately pleaded facts that plausibly allege that the payments were not covered by RESPA's safe harbor.

Plaintiffs may not succeed on their claim. But that is not the test. They have plausibly alleged that the payments from All Star to the third-party marketing companies do not fall within Section 8's safe harbor provision. *See Alexander v. Washington Mut., Inc.*, No. 07-4426, 2008 WL 2600323, at \*4 (E.D. Pa. June 30, 2008) (noting that plaintiffs had sufficiently pleaded around the safe harbor provision by alleging that the "payments" were "for services not actually performed. . . .").

## C. RICO

MLD argues that plaintiffs have not adequately asserted a RICO claim because they failed to allege (1) acts that satisfy the definition of racketeering activity or (2) the existence of a RICO enterprise. ECF 27-1 at 5-8; ECF 29 at 4-6.

Congress enacted the Racketeer Influenced and Corrupt Organizations law as Title IX of the Organized Crime Control Act of 1970, Pub. L. No. 91–452, 84 Stat. 922 (1970), 18 U.S.C. §§ 1961-1968. *See ESAB Grp., Inc. v. Centricut, Inc*., 126 F.3d 617, 626 (4th Cir. 1997). Under 18 U.S.C. § 1962, it is unlawful, *inter alia*, for any person employed by or associated with any enterprise to conduct or participate in the "enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

RICO is not limited to criminal cases. In addition to criminal penalties, Congress "granted a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of' the RICO provisions." *ESAB Grp.*, 126 F.3d at 626 (citing 18 U.S.C. § 1964(c)).

A civil RICO action "'is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'" *U.S. Airline Pilots Ass'n v. Awappa, LLC,* 615 F.3d 312, 317 (4th Cir. 2010) (citation omitted); *see, e.g.*, *Lewis v. Maryland*, PWG-17-1636, 2018 WL 1425977, at *5 (D. Md. Mar. 22, 2018); *Bailey v. Atlantic Auto. Corp.*, 992 F. Supp. 2d 560, 578 (D. Md. 2014). A prevailing plaintiff in a civil RICO action is entitled to treble damages, costs, and attorney's fees. *Friedler v. Cole*, CCB-04-1983, 2005 WL 465089, at *7 (D. Md. Feb. 28, 2005). The Supreme Court has characterized RICO's civil penalties as "'drastic.'" *Awappa*, 615 F.3d at 317 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989)); *see* 18 U.S.C. § 1964(c)).

To plead a civil RICO claim, the plaintiff must allege "'1) conduct [causing injury to business or property] 2) of an enterprise 3) through a pattern 4) of racketeering activity.'" *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)); *see Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (citing 18 U.S.C. §§ 1962, 1964); *see also Bhari Info. Tech. Sys. Private Ltd. v. Sriram*, 984 F. Supp. 2d 498, 503 (D. Md. 2013); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 842 (D. Md. 2013); *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 472 (D. Md. 2012).

Congress has directed that the statute "be liberally construed to effectuate its remedial purposes." Pub. L. 91–452, § 904(a), 84 Stat. 941, 947. But, "Congress contemplated that only a party engaging in widespread fraud would be subject to" the "serious consequences" available under the RICO statute, such as treble damages. *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989). And, courts have recognized the "need to limit [RICO's] severe penalties to

offenders engaged in ongoing criminal activity, rather than isolated wrongdoers." *Friedler*, 2005 WL 465089, at *7.

Indeed, the Fourth Circuit "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988). The Fourth Circuit has noted the "distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *El-Shamari*, 217 F.3d at 238. It has admonished that courts must

> exercise caution "to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted."

*Awappa*, 615 F.3d at 317 (quoting *Menasco, Inc.*, 886 F.2d at 683) (ellipsis in *Awappa*).

In other words, RICO "'is reserved for conduct whose scope and persistence pose a special threat to social well-being.'" *Biggs v. Eaglewood Mortg., LLC*, 582 F. Supp. 2d 707, 714 (D. Md. 2008), *aff'd*, 353 F. App'x 864 (4th Cir. 2009). It applies to "'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *Menasco, Inc.*, 886 F.2d at 684 (quoting *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987)).

In order to analyze the adequacy of a RICO claim, it is important to understand RICO's terms and concepts.

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). *See, e.g.*, *Boyle v. United States*, 556 U.S. 938, 944 (2009);

*Kimberlin v. Nat'l Bloggers Club*, GJH-13-3059, 2015 WL 1242763, at *3 (D. Md. Mar. 17, 2015). In *Mitchell Tracey*, 935 F. Supp. 2d at 842, the court explained:

> An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477-78 (D. Md. 2009). "[A]n associated-in-fact enterprise is one type of enterprise defined in § 1961(4)." *United States v. Tillett*, 763 F.2d 628, 631 n.2 (4th Cir. 1985).

Because "'an enterprise includes any union or group of individuals associated in fact,'" RICO extends to "'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. at 944 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)). A RICO enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods." *Id.* at 948; *see United States v. Pinson*, 860 F.3d 152, 162 (4th Cir. 2017) (stating that a RICO enterprise "need not have a rigid structure…."). However, "'[v]ague allegations of a RICO enterprise . . . lacking any distinct existence and structure' will not survive dismissal." *Mitchell Tracy*, 935 F. Supp. 2d at 843 (citation omitted; modifications in *Mitchell Tracy*).

Notably, "an association-in-fact enterprise must have at least three structural features." *Boyle*, 556 U.S. at 946. These include "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.*; *accord Pinson*, 860 F.3d at 161.

"Racketeering activity" is defined in § 1961(1)(B) to include a laundry list of "indictable" acts, such as mail fraud, wire fraud, financial institution fraud, among many other crimes. As indicated, however, "RICO is not 'aimed at the isolated offender.'" *Zepkin*, 812 F.2d at 155 (quoting *Sedima*, 473 U.S. at 496 n.14). Therefore, "[t]he pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing

the defendant as a person who regularly commits such crimes." *Lipin Enters. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986).

A "pattern of racketeering activity" requires "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "[W]hile two acts are necessary, they may not be sufficient." *Sedima*, 473 U.S. at 496 n.14. To prove a pattern, a plaintiff is required to show that the predicate acts "are [1] related *and* [2] that they amount to or pose a threat of *continued* criminal activity." *H.J. Inc.*, 492 U.S. at 239 (first emphasis in original; second emphasis added). Judge Chasanow has reiterated: "To allege a pattern of racketeering activity, a plaintiff must present facts making it plausible, rather than possible, that: (1) at least two predicate acts occurred within ten years of each other; (2) the predicate acts were related; and (3) the acts 'amount to or pose a threat of continued criminal activity.'" *Swarey v. Desert Capital REIT, Inc.*, DKC-11-3615, 2012 WL 4208057, at *12 (D. Md. Sept. 20, 2012) (quoting *H.J. Inc.*, 492 U.S. at 239).

Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation omitted). And, the enterprise's actions must affect interstate commerce. *Sterling v. Ourisman Chevrolet of Bowie, Inc.* 943 F. Supp. 2d 577, 587-88 (D. Md. 2013).

As indicated, a pattern of racketeering activity involves *continued* criminal activity. *H.J. Inc.*, 492 U.S. at 239. The Fourth Circuit has adopted a "flexible" approach to the "continuity" requirement. *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1989), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). Courts utilize a "case-by-case analysis, *Capital Lighting and Supply, LLC v. Wirtz*, JKB-17-3765, 2018 WL 3970469, at

*6 (D. Md. Aug. 20, 2018), and consider "the 'criminal dimension and degree' of the alleged misconduct." *HMK Corp. v. Walsey*, 828 F.2d 1071, 1073 (4th Cir. 1987) (citation omitted); *see Zepkin*, 812 F.2d at 155 ("[N]o mechanical test can determine the existence of a RICO pattern."); *Brandenburg*, 859 F.2d at 1185 (noting that continuity depends on "all the facts and circumstances of the particular case—with special attention to the context in which the predicate acts occur").

"'Continuity' is both a closed – and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241.  The Fourth Circuit explained in *Menasco*, 886 F.2d at 683-84:

> Continuity . . . refers to a closed period of *repeated* conduct, or to past conduct that by its nature projects into the future with a threat of *repetition*.  To satisfy the continuity element, a plaintiff must show that the predicates themselves amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity.  Significantly, [p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.  Thus, predicate acts must be part of a prolonged criminal endeavor.

 (Internal quotation marks, citations, and parentheticals omitted; alteration and emphasis in original).

As to continuity, "[f]acts relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg*, 859 F.2d at 1185.

Where a fraud claim is asserted as the predicate act for a civil RICO violation, Rule 9(b)'s particularity requirement applies.  *See, e.g.*, *Lewis*, 2018 WL 1425977, at *5 (applying heightened pleading standard to claims under RICO); *Healy v. BWW Law Grp., LLC*, PWG-15-

3688, 2017 WL 281997, at *6 (D. Md. Jan. 23, 2017) (same); *Kimberlin v. Hunton & Williams LLP*, GJH-15-723, 2016 WL 1270982, at *7 (D. Md. Mr. 29, 2016) (applying Fed. R. Civ. P. 9(b) to RICO claim based on mail or wire fraud), *aff'd*, 671 F. App'x 127 (4th Cir. 2016); *Bailey*, 992 F. Supp. 2d at 584 ("A plaintiff must plead circumstances of the fraudulent acts that form the alleged pattern of racketeering activity with sufficient specificity pursuant to Fed. R. Civ. P. 9(b).") (citations and quotation marks omitted); *Sriram*, 984 F. Supp. 2d at 505.

### 1. Racketeering Activity: Predicate Acts

In support of their RICO claim, plaintiffs have alleged two predicate acts of racketeering activity: mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. ECF 1, ¶ 243.

In order to show mail or wire fraud as a predicate act, a plaintiff must show (1) a scheme to defraud and, (2) use of the mails or wires in furtherance of the scheme. 18 U.S.C. §§ 1341, 1342; *Chisolm v. TranSouth Fin. Corp.*, 95 F. 3d 331, 336 (4th Cir. 1996). In addition, when mail and wire fraud are asserted as predicate acts in a civil RICO claim, each must be pled with particularity under Rule 9(b). *Menasco*, 886 F.2d at 684. This means the Complaint must allege the "time, place, and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby." *Harrison*, 176 F. 3d at 784 (internal citation omitted). "However, '[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which he will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *Scott v. WFS Fin., Inc.*, No. 2:06cv349, 2007 WL 190237, at *5 (E.D. Va. Jan. 18, 2007) (quoting *Harrison*, 176 F. 3d at 784).

Further, "[w]hile a plaintiff normally must plead specific instances of mail or wire fraud, such a requirement is relaxed where there are 'numerous mailings of standardized documents containing identical false representations.'" *VNA Plus, Inc. v. Apria Healthcare Group, Inc.*, 29 F. Supp. 2d 1253, 1263 (D. Kan. 1998) (quoting *City of New York v. Joseph L. Balkan, Inc.*, 656 F. Supp. 536, 545 (E.D.N.Y. 1987)); *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 598 (D. Md. 2014). In these cases, "Rule 9(b) may be satisfied if the complaint sufficiently identifies '[t]he time period involved and the content of the misrepresentations.'" *VNA Plus*, 29 F. Supp. 2d at 1263 (quoting *Hurd v. Monsanto Co.*, 908 F. Supp. 604, 614 (S.D. Ind. 1995)). And, "[t]he mailings or wirings do not have to contain the misrepresentations that defrauded the plaintiff, but merely be in furtherance of the fraudulent, material misrepresentation upon which the plaintiff relied to his detriment and may include mailings and wirings directed at nonparties." *Proctor*, 64 F. Supp. 2d at 473; *Day v. DB Capital Group, LLC,* DKC-10-1658, 2011 WL 887554, at *10 (D. Md. Mar. 11, 2011); *Schmuck v. United States*, 489 U.S. 705, 710 (1989); *In re Am. Honda Motor Co. Dealerships Litig.*, 941 F. Supp. 528, 546 n.19 (D. Md. 1996).

MLD asserts that the "vague and unsubstantiated allegations" as to mail and wire fraud in the Complaint "fall far short of the particularity necessary with respect to fraud claims." ECF 27-1 at 7. I disagree.

The Complaint alleges that there were thousands of mailers sent to lure potential borrowers, the time frame during which they were sent, who sent them, and how the mailers furthered the scheme to defraud. *VNA Plus*, 29 F. Supp. 2d at 1263; *see, e.g.*, ECF 1, ¶¶ 49, 50, 54, 55, 61, 62, 65-66, 68-69, 73, 7427, 56-60, 175. The Complaint also identifies with specificity defendant's use of interstate wires to receive and accept illegal kickbacks. *See, e.g., id.* ¶¶ 49, 54.

Plaintiffs do not specify the content of the mailings in questions. However, "extensive Fourth Circuit case law holds that a mailing's contents need not contain false representations in order to constitute mail fraud…Rule 9(b) requires the contents of the misrepresentations at issue to be detailed to sufficiently plead mail fraud, but the mailings themselves need not contain the misrepresentations." *Brasko v. Howard Bank*, SAG-20-3489 2021 WL 1662464, at *4 (D. Md. Apr. 27, 2021). Here, the core misrepresentations are the fraudulent title and settlement service charges and related statements and concealments made by All Star and MLD in the loan documentation provided to the borrowers. *See, e.g.*, ECF 1, ¶¶ 120-133. The mailings were allegedly made to facilitate the scheme by soliciting those borrowers in the first place. It is the content of the misrepresentations related to the fraudulent service charges that the Complaint must and has detailed, not the content of items sent by mail

Accordingly, I conclude that plaintiffs have alleged, with sufficient particularity, that MLD engaged in a scheme to defraud borrowers and used the mail and wire services to further that scheme. *See Somerville*, 2019 WL 6131288, at *4; *Mitchell Tracey*, 935 F. Supp. 2d at 845 (finding sufficient allegations of mail and wire fraud where the complaint alleged "specific dates when [defendant] used the mail and electronic communication to further its scheme" and stated that distributions of the profits were sent interstate); *WW, LLC v. Coffee Beanery, Ltd.*, WMN-05-3360, 2012 WL 3728184, at *11 (D. Md. Aug. 27, 2012) (finding plaintiffs satisfied Rule 9(b) because they "outlined the alleged scheme to defraud, a time frame for the scheme, who was targeted by the scheme and the contents of the allegedly fraudulent communications that were sent using the mails and wires, and what Defendants hoped to obtain through the scheme.").

## 2. **Enterprise**

In its reply, defendant argues that plaintiffs have not adequately alleged the existence of a RICO enterprise. In particular, MLD contends that the Complaint "is bereft of allegations suggesting that the participating mortgage lenders were working together in furtherance of the scheme or, indeed, that they were even aware of each other's existence." ECF 29 at 6. And, defendant asserts that this Court's ruling in *Donaldson*, 2020 WL 3184089, is dispositive here because the facts of both cases are the same. *Id.* at 5-6.

Because MLD mentions this argument for the first time in its reply, I need not consider this contention. *See United States v. Al–Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) (declining to consider argument first raised in reply brief and noting that it "is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned"); *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").

In any event, the contention does not support dismissal. In *Donaldson*, which also involved allegations of kickbacks paid by All Star through a third-party company, I concluded that plaintiffs failed plausibly to allege a RICO enterprise. 2020 WL 3184089, at *25-26. The Complaint identified the participants of the scheme as All Star, the defendant bank, and other "Participating Lenders," which, as I noted, was of a hub and spoke variety. *Id.* at *26. But, I found that the allegations failed to allege facts connecting the spokes to each other, so as to constitute an enterprise. *Id.* Moreover, even though plaintiffs argued that they could limit their RICO claim to that of a bilateral enterprise, I concluded that this would require rewriting the Complaint. *Id.*; *see also Kadow*, 2020 WL 5230560, at *10 ("Plaintiffs seeks to have it both

ways, writing nearly 300 paragraphs about how CBC National and other Participating Lenders participated in the 'All Star scheme' but then ask the Court to find that the alleged agreement between CBC National and All Star on its own constitutes a RICO conspiracy."). Therefore, I dismissed plaintiffs' RICO claim. *Donaldson*, 2020 WL 3184089, at *25-26; *see Kadow*, 2020 WL 5230560, at *10 ("[I]f all of the Participating Lenders are involved, the RICO claim fails as a rimless hub and spoke conspiracy.").

In contrast to the complaints in both *Donaldson* and *Kadow*, the Complaint in this case alleges a bilateral enterprise. Plaintiffs assert: "For a continuous period of at [least] two years, The Money Store and All Star associate and commit the predicate acts pled herein…for the common purpose of defrauding borrowers into paying fraudulent charges for title and settlement services." ECF 1, ¶ 241.

Thus, the question is whether the bilateral enterprise as alleged by plaintiffs constitutes an "association-in-fact" enterprise for the purpose of asserting a RICO claim. As indicated, under RICO "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. Further, the group must engage in a course of conduct for a common purpose and on behalf of the enterprise, as opposed to "'their individual capacities, to advance their individual self-interests.'" *Peters v. Aetna, Inc.*, 15-cv-0109-MR, 2016 WL 4547151, at *1 (W.D.N.C. Aug. 31, 2016) (quoting *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013)); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981).

At this stage of the case, the Court is satisfied that plaintiffs have adequately alleged an association-in-fact enterprise. First, plaintiffs plainly allege that a bilateral enterprise existed and

its members had a "common purpose": to "defraud[] borrowers into paying higher and fixed prices for title and settlement services." ECF 1, ¶¶ 241, 242. *See Mitchell Tracey*, 935 F. Supp. 2d at 843-44 (finding an association-in-fact enterprise existed where its common purpose "was to charge borrowers inflated and illegal fees, to defraud members of the public and to give effect to the scheme described by a distinct division of labor"). Second, plaintiffs have adequately alleged that the individual members of the enterprise had relationships with each other and carried out specific roles in furtherance of the enterprise. *See, e.g.*, ECF 1, ¶¶ 51, 64-72. Finally, the members of the enterprise were associated with each other for an extended period of time—at least two years, if not longer. ECF 1, ¶ 241. *See Brasko*, 2021 WL 1662464, at *7 (finding that "Plaintiffs allege facts that go far beyond an ordinary commercial relationship in which First Mariner and All Star operated exclusively for their own interests, outlining at length …coordination of mailing campaigns and changes to the fraudulent fee structures").

These allegations are sufficient to meet the test laid out by the Supreme Court in *Boyle*, 556 U.S. at 946; *see Capital Lighting*, 2018 WL 3970469, at *12. Accordingly, I conclude that plaintiffs have plausibly alleged the existence of a RICO enterprise.

## IV. Conclusion

For the foregoing reasons, I shall deny the Motion.

An Order follows.

Date:  July 16, 2021

_____
        /s/
Ellen Lipton Hollander
United States District Judge